# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIMBERLEY STOPPI,** | : | **No. 3:09cv916** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WAL-MART TRANSPORTATION, LLC,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court is defendant's motion for summary judgment. Having been fully briefed and argued, the matter is ripe for disposition.

## Background

This case concerns Plaintiff Kimberly Stoppi's employment with Defendant Wal-Mart Transportation, LLC. Plaintiff claims that defendant discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, when she was not interviewed for a management position at the Wal-Mart transportation center in Pottsville, Pennsylvania.

Plaintiff originally applied for a position at the Wal-Mart Transportation Center in Pottsville, Pennsylvania in June 2006. (Defendant's Statement of Material Facts (Doc. 20) (hereinafter "Defendant's Statement") at ¶ 1). Prior to gaining employment at Wal-Mart, plaintiff worked as a waitress and a truck driver for several companies.

(Id. at ¶ 4). In 2002, she attended Schuylkill Training and Technology Center, obtaining a commercial driver's license. (Id. at ¶ 5). On June 22, 2006, Wal-Mart offered plaintiff a position as Driver Coordinator/Router at the Wal-Mart Distribution Center in Pottsville. (Id. at ¶ 6).

When plaintiff began her employment, Wal-Mart provided her with a job description for the Driver Coordinator/Router position. (Id. at ¶ 7). On June 22, 2006 plaintiff signed the job description, acknowledging the essential functions of the job and averring that she could perform those functions with or without accommodations. (Id. at ¶ 8). Among those "essential functions" were "accurately and efficiently recording the activities of Wal-Mart truck drivers and planning deliveries to Wal-Mart stores in a cost efficient and timely manner." (Id. at ¶ 9). Plaintiff's job consisted of coordinating 20 to 30 Wal-Mart truck drivers in making deliveries to area Wal-Mart stores. (Id. at ¶ 10). Other duties include planning the loading of drivers' trucks. (Id.).

Plaintiff began working for defendant on July 10, 2006. (Id. at ¶ 11). Plaintiff received a six-month performance evaluation on January 10, 2007. (Id. at ¶ 12). That performance review noted that plaintiff needed to learn routing and trailer planning. (Id.). Plaintiff notes that the review also found among her strengths customer service, dependability, teamwork and dedication. (Plaintiff's Counterstatement of Material Facts (Doc. 30) (hereinafter "Plaintiff's Statement") at ¶ 12). Her overall performance rating was "good." (Id.). Plaintiff signed this

2

evaluation, agreeing with management's assessment. (Defendant's Statement at ¶ 13).

Plaintiff received her first annual evaluation on July 10, 2007. (Id. at ¶ 14). The parties disagree about how this document should be interpreted. Defendant points out that the evaluation stated that plaintiff needed to improve her reaction to other employees' actions and focus her attention to details. (Id.). Further, plaintiff continued to need training on routing and trailer planning. (Id.). Plaintiff admits that the evaluation found that she needed to improve her reaction to other employees, but points out that the evaluator also found she usually worked well with others. (Plaintiff's Statement at ¶ 14). She adds that the evaluation concluded her work was mostly error free, that she was thorough in performing her daily tasks, and that she needed "'to continue to focus' on attention to detail." (Id.). Though the evaluation stated that plaintiff needed to obtain training in routing and trailer planning, the evaluation also emphasized that plaintiff "'always [sought] to learn new and different tasks, for example trailer tracking.'" (Id.). Plaintiff's overall performance rating was "good." (Id.). Plaintiff reviewed and signed the evaluation. (Defendant's Statement at ¶ 15).

Plaintiff's July 10, 2008 performance review indicated that she needed to improve her communication and teamwork with other employees. (Id. at ¶ 16). The review also contended that plaintiff needed to pay greater attention to detail. (Id.). Finally, the review documented plaintiff's absenteeism. (Id.). Still, the plaintiff

3

received an overall rating of "good." (Plaintiff's Statement at ¶ 16). Plaintiff reviewed and signed the evaluation. (Defendant's Statement at ¶ 17). She acknowledged she need to improve both her attendance and communication with coworkers. (Id.).

Plaintiff received another evaluation on July 10, 2009. (Id. at ¶ 18). That review indicated that she needed to focus on routing processes and procedures. (Id.). The report also noted a continued problem with absenteeism. (Id.). Still, plaintiff's overall rating was "good." (Plaintiff's Statement at ¶ 18). Plaintiff reviewed and signed this evaluation. (Defendant's Statement at ¶ 19). Defendant contends that plaintiff's signature demonstrates that she agreed with this assessment. (Id.). Plaintiff denies that she agreed with this assessment in signing the review. (Id.). Plaintiff failed to report to scheduled work hours and had "significant attendance problems" in 2008 and 2009. (Defendant's Statement at ¶ 20). Plaintiff admits that she frequently missed work during this period, but blames her attendance problems on the harassment she allegedly suffered from Jack Brong. (Plaintiff's Statement at ¶ 20).

Plaintiff was diagnosed with bipolar disorder in her early thirties. (Id. at ¶ 21). There are several types of bipolar disorder. (Defendant's Statement at ¶ 23). All of these types involve episodes of depression and mania to some degree. (Id.). The primary symptom of the disorder is dramatic and unpredictable mood swings. (Id. at ¶ 24). The manic phase can involve inflated self-esteem, poor judgment, agitation or irritation, inability to concentrate, frequent absences from work, delusions, paranoia,

4

psychosis and poor work performance.  (Id. at ¶ 25).  The depressive phase has symptoms that include anxiety, loss of interest in daily activities, problems in concentration, irritability, frequent absences from work, and poor job performance. (Id. at ¶ 26).  Plaintiff displays a number of symptoms, including: difficulty concentrating and interacting with others; problems with manual tasks; difficulty sleeping, thinking and responding to criticism; fatigue; loss of motivation; irritability; mood swings; dissociation; feeling overwhelmed; anxiety; confusion; poor concentration; panic attacks and paranoia.  (Id. at ¶¶ 27-28).

Plaintiff has at points refused to take her medication or participate in psychotherapy, and has disregarded her doctor's advice on other portions of her treatment  (Id. at ¶ 29).  Plaintiff explains that she decided to stop taking her medication because she did not think its continued use necessary and lacked health care to pay for it.  (Plaintiff's Statement at ¶ 29).  Defendant contends that plaintiff routinely skips or cancels therapy sessions and has refused therapy altogether. (Defendant's Statement at ¶ 30).  Plaintiff denies this.  (Plaintiff's Statement at ¶ 30). Defendant also alleges that plaintiff frequently stops taking her medication, against her doctor's advice.  (Defendant's Statement at ¶ 31).  Plaintiff admits that she has stopped taking medication on her own, but not against her doctor's advice. (Plaintiff's Statement at ¶ 31).

When defendant hired plaintiff she was not taking any medication for her disorder.  (Defendant's Statement at ¶ 32).  The parties disagree about whether

5

plaintiff had orders from a doctor to take this medication, or if she was not being treated at that point. (Id.; Plaintiff's Statement at ¶ 32). In or around September 2007, plaintiff resumed treatment for her condition. (Defendant's Statement at ¶ 33). Plaintiff notes that she resumed treatment two months before she took a leave of absence for six weeks. (Plaintiff's Statement at ¶ 33). During this period, plaintiff was treated as an outpatient. (Id.). The parties disagree about whether plaintiff stopped treatment in October 2008. (Defendant's Statement at ¶ 34; Plaintiff's Statement at ¶ 34). Plaintiff stopped taking her medication on her own in April or May 2009. (Defendant's Statement at ¶ 35). She did so despite doctor's orders to the contrary. (Id.). She resumed taking the medication in October or November 2009. (Id.). While the parties agree that plaintiff needs therapy and medication to treat her condition, plaintiff contends that this need is not constant, and that she can determine when further treatment is necessary. (Defendant's Statement at ¶ 36; Plaintiff's Statement at ¶ 36).

Defendant granted plaintiff a leave of absence related to her medical condition in November 2007. (Defendant's Statement at ¶ 37). The leave of absence began on November 12, 2007 and lasted six weeks. (Id. at ¶ 38). Defendant granted plaintiff a second leave of absence beginning on November 14, 2009. (Id. at ¶¶ 39-40). Plaintiff returned to work on January 3, 2010. (Id. at ¶ 40). While the parties agree that defendant granted plaintiff's request for a leave of absence, they disagree about whether defendant interfered with plaintiff's rights under the Family and

6

Medical Leave Act ("FMLA").  (Defendant's Statement at ¶ 41; Plaintiff's Statement at ¶ 41).  Plaintiff contends that she engaged in protected activity by requesting leave, and that defendant engaged in discriminatory conduct in retaliation for this request.  (Plaintiff's Statement at ¶ 41).  Plaintiff contends that defendant prevented her from interviewing for a management position despite her qualifications and singled her out for unwarranted discipline.  (Id.).  Plaintiff also alleges that defendant subjected her to harassment and a hostile work environment on account of her illness.  (Id.).

At the time she applied for her job at Wal-Mart, plaintiff did not disclose to Wal-Mart that she suffered from bipolar disorder.  (Defendant's Statement at ¶ 2).  The parties disagree about whether plaintiff requested an accommodation for her bipolar disorder.  Defendant insists that she did not.  (Id. at ¶ 3).  Plaintiff contends that she was not aware that defendant had an ADA policy where she could work with an ADA coordinator to find accommodations for her disability.  ("Plaintiff's Statement at ¶ 3).  Instead, she spoke with her supervisor, Jack Brong, and asked to be seated away from a window while she adjusted to her medication.  (Id.).  Taking the medication apparently weakened plaintiff's eyesight and made her hands unsteady.  (Id.).  Plaintiff testified that Brong refused this request and insisted that she perform at one-hundred percent or take a leave of absence.  (Id.).  Other supervisors repeated this injunction.  (Id.).  Plaintiff instead stopped taking her medication, suffering as a result.  (Id.).

Plaintiff contends that she complained to Operations Manager Paul Brown about Brong's alleged harassment and retaliation. (Id. at ¶ 93). Brown responded by asking plaintiff if she felt she was "above the law." (Id.). Plaintiff and another worker, Kim Marlow, complained to a supervisor about Brong's alleged daily harassment. (Id. at ¶ 94). Plaintiff reported that she came to work "on pins and needles." (Id. at ¶ 95). Brong's treatment of plaintiff helped create these moods: "I don't know if he's just going to yell at me, I don't know if he's just going to ignore me. I don't know, you know, what he is going to dig upon on me today because yesterday was a bad day." (Id.). Plaintiff contends defendant did nothing to address this situation. (Id. at ¶ 95).

Plaintiff returned to work, full time, with no job restriction on December 26, 2007. (Defendant's Statement at ¶ 42). Wal-Mart reinstated plaintiff to her position as Driver Coordinator/Router the next day. (Id. at ¶ 43). She received the same pay, benefits and seniority as when she left. (Id.). The parties disagree, as above, on whether plaintiff actually requested an accommodation for her disability. (Id. at ¶ 44; Plaintiff's Statement at ¶ 44). The parties disagree about whether defendant failed to accommodate her disorder. (Defendant's Statement at ¶ 45; Plaintiff's Statement at ¶ 45).

When plaintiff returned to work in December 2007 there was a vacancy in a management position at the facility. (Defendant's Statement at ¶ 46). Tom Lynch, Human Resources Manager, told plaintiff of this position. (Id. at ¶ 47). Plaintiff

8

contends that he asked her if she wanted to interview for the job. (Plaintiff's Statement at ¶ 47). Plaintiff was enthusiastic about the possibility of applying. (Id. at ¶ 48). Wal-mart chose not to interview plaintiff for the position. (Defendant's Statement at ¶ 51). The parties disagree about why defendant made that decision. Defendant contends that plaintiff lacked recent supervisory or management experience, and that it exercised business judgment in choosing to interview other employees with more relevant experience. (Id. at ¶¶ 49, 51). Plaintiff contends that she was "well-qualified for the position"; she had nearly five years experience in transportation, had trained new employees, and was a "manager at a travel plaza." (Plaintiff's Statement at ¶ 49). Employees who received interviews lacked the experience in transportation that she had; one interviewee had worked in a bingo hall prior to working for the defendant and another worked in a dentist's office. (Id. at ¶ 50). Ultimately, defendant did not fill the management position. (Defendant's Statement at ¶ 56).

Area Manager Jack Brong became plaintiff's supervisor in early 2008. (Id. at ¶ 57). Brong did not supervise plaintiff prior to or during her 2007 leave of absence. (Id. at ¶ 58). He never made any derogatory remarks to plaintiff regarding her illness or her leave of absence. (Id. at ¶ 59). Brong also never reduced plaintiff's hours or pay because of her performance, and never disciplined her in a way that would affect her wages or hours. (Id. at ¶ 60). Brong's evaluation of plaintiff in 2009 was fair. (Id. at ¶ 61). The parties disagree, however, over whether Brong retaliated

against plaintiff for seeking leave and because of her disability. Plaintiff alleges that Brong harassed and retaliated against her. (Plaintiff's Statement at ¶ 61). She contends that she was singled out by Brong for harassment. (Id.). Brong "constantly threatened Plaintiff with write-ups and termination and he was trying to get Plaintiff fired." (Id.). Plaintiff testified that Brong would confront her in the office in front of coworkers, threatening her and treating her like a child. (Id.). He would point his finger in plaintiff's face and warn her that she would be held accountable if another mistake occurred. (Id.). The mistakes, however, were never the plaintiff's work, but instead that of other employees. (Id.). Plaintiff felt that this treatment came because of her illness and the leave she took. (Id.). Plaintiff also received less desirable work assignments and found some of her previous work assigned to other employees when she returned after her leave. (Id.). Brong prevented plaintiff from receiving additional training and experience in routing, since he assigned her to such work only on Saturday, the day with the least work. (Id.). Still, plaintiff agrees that defendant did not discipline her or evaluate her inappropriately, and that her job reviews were not "adversely affected" by her illness. (Defendant's Statement at ¶¶ 62-63).

An essential part of plaintiff's job is accurately and efficiently to plan and route Wal-Mart truck drivers to area stores for deliveries. (Id. at ¶ 64). Defendant contends that plaintiff's absenteeism adversely affected her ability to obtain training on the essential functions of her job. (Id. at ¶ 65). Plaintiff points out that her

performance ratings in 2007 did not indicate that she had failed to complete training on routing and trailer planning, but that she had not been given the opportunity to attend it. (Plaintiff's Statement at ¶ 66). Plaintiff insists that she requested training and defendant denied her that training. (Id.). Defendant alleges that plaintiff struggled with routing and thus failed to perform the essential functions of her job. (Defendant's Statement at ¶ 67). Plaintiff agrees that she struggled with this job, but points to positive performance ratings to argue that she did perform her job's essential functions. (Plaintiff's Statement at ¶ 67).

Plaintiff alleges that Wal-Mart subjected her to a hostile work environment based on her disability. She bases this claim on several incidents:

> On December 27, 2007, a driver, Randy Smith, commented in the breakroom in front of plaintiff that workers can get a "mental leave" at Wal-Mart;
> On January 13, 2008, another driver, Francis Sobel saw plaintiff crumple a piece of paper and asked her if she was having a "bipolar moment";
> Plaintiff heard other workers talking about taking medication, "looney bins" and "going postal" around the workplace;
> In November, 2008, Driver John Bosna asked plaintiff if she had forgotten to "take her pill." In December, he told plaintiff "I see you took your prozac."; and
> In March 2008, a coworker, Janice Matico, gave plaintiff a coffee mug with the character "Dopey" on it.

(Defendant's Statement at ¶ 68)

Plaintiff points to no other incidents of harassment. (Id. at ¶ 69). Plaintiff did not report these incidents to management or complain about inappropriate comments. (Id. at ¶ 70). Plaintiff insists that she "intended" to report these comments "immediately," but did not when Tom Lynch approached her with information about the management vacancy for which she applied. (Plaintiff's Statement at ¶ 70).

11

Instead, plaintiff's first complaints about the inappropriate comments Smith and Sobol made came about a month after they made them. (Defendant's Statement at ¶ 71). Plaintiff contends that she complained to numerous Wal-Mart managers about the comments, but they either told her that she misunderstood the comments or promised to investigate but did nothing. (Plaintiff's Statement at ¶ 71). The parties disagree about whether Dawn Brock, a manager, knew of plaintiff's condition before plaintiff complained to her. (Defendant's Statement at ¶ 72; Plaintiff's Statement at ¶ 72). They also disagree about whether Brock actually addressed plaintiff's complaint. (Id.). The parties agree, however, that no incidents involving Smith or Sobel occurred after plaintiff complained to Brock about them. (Defendant's Statement at ¶ 73; Plaintiff's Statement at ¶ 73).

Plaintiff did not complain to Wal-Mart management about the general comments she heard at work referencing "looney bins," medication and "going postal." (Defendant's Statement at ¶ 74). These comments, she concluded, were not directed at her. (Id.). Though they were not directed specifically at her, plaintiff contends, "they were meant for her as they all related to bipolar." (Plaintiff's Statement at ¶ 74). She also did not complain because she felt that defendant would not remedy the situation. (Id.).

Plaintiff did complain to Operation Manager Paul Brown about the "Dopey" mug she received from Janice Matico. (Defendant's Statement at ¶ 75). When she complained, he laughed. (Plaintiff's Statement at ¶ 75). The parties disagree about

whether Brown knew of plaintiff's medical condition.  (Defendant's Statement at ¶ 76; Plaintiff's Statement at ¶ 76).  Plaintiff contends that Brown knew of her illness because defendant's Human Resources Office had "leaked" that information. (Plaintiff's Statement at ¶ 76).   After that incident, Matico never made another offensive comment towards plaintiff or acted in an offensive way towards her. (Defendant's Statement at ¶ 77).  Defendant contends that Matico's behavior changed because Brown spoke with her, while plaintiff insists that Brown did not address the issue with Matico at all.  (Defendant's Statement at ¶ 77; Plaintiff's Statement at ¶ 77).  Plaintiff contends that Brown simply laughed and told plaintiff "it was all in her head."  (Plaintiff's Statement at  ¶ 77).

Plaintiff also complained to General Transportation Manager Kathi Goode and Human Resources Manager Sue Pozar about Bosna's comments to her. (Defendant's Statement at ¶ 78).  Goode and Pozar addressed these complaints and plaintiff never had another problem with Bosna.  (Id. at ¶ 79).

Defendant has an ADA compliance policy.  (Id. at ¶ 80).  This policy provides a means for employees to request reasonable accommodations for their disabilities. (Id.).  Defendant contends that this policy did not prevent discrimination in her case. (Plaintiff's Statement at ¶ 80).  The policy also provides that Wal-Mart will not engage in any discrimination or retaliation on the basis of disability.  (Defendant's Statement at ¶ 81).   Defendant contends that Wal-Mart did not comply with this policy in her case.  (Plaintiff's Statement at ¶ 81).

Defendant also has a leave of absence policy. (Defendant's Statement at ¶ 84). This policy allows employees to take time off from work and still maintain benefits and employment. (Id.). Medical leave may be granted under the policy to workers who are unable to perform their regular duties due to illness. (Id.). Plaintiff agrees that this policy exists, but contends defendant violated it in her case, and retaliated against her for seeking FMLA leave. (Plaintiff's Statement at ¶ 84).

Wal-Mart also has a discrimination and harassment prevention policy. (Defendant's Statement at ¶ 85). This policy prohibits any sort of discrimination, harassment and retaliation in Wal-Mart business on the basis of race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, sexual orientation or other legally protected statuts. (Id. at ¶¶ 85-86). Wal-Mart promises to investigate any complaints under this policy seriously and promptly, and provides a means for employees to raise complaints. (Id. at ¶¶ 87-88). Workers are instructed to report any violations of the policy immediately to management or to use a confidential hotline to complain. (Id. at ¶ 89). Such employees may also complain to any member of management, regardless of the "chain of command." (Id. at ¶ 90). All workers receive training on these employment policies. (Id. at ¶ 91). Plaintiff received this training on July 31, 2006. (Id. at ¶ 92).

Plaintiff filed her complaint on May 14, 2009. (See Doc. 1). The complaint consists of two counts. Count I alleges that defendant violated the ADA by discriminating against plaintiff on the basis of her disability and retaliating against her

14

for complaining about that discrimination. Count II alleges that defendant retaliated against plaintiff for requesting leave under the Family and Medical Leave Act. Defendant answered the complaint, and the parties engaged in discovery. At the close of discovery, the defendant filed the instant motion. After the parties briefed the issues, the court held oral argument, bringing the case to its present posture.

**Jurisdiction**

As the plaintiff brings this action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Legal Standard**

The case is before the court on defendant's motion for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

15

247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986).

**Discussion**

The defendant seeks summary judgment on both of plaintiff's claims. The court will address each in turn.

### A. Employment Discrimination under the ADA

Defendant first argues that plaintiff cannot prevail on her discrimination claim pursuant to the ADA. The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and

16

other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).

Further, an employer must make reasonable accommodations to known physical or

mental limitations of an otherwise qualified employee with a disability unless such

employer can demonstrate the accommodation would impose an undue hardship on

the operation of the employer's business. Id. See Taylor v. Phoenixville Sch. Dist.,

184 F.3d 296, 306 (3d Cir. 1999) (holding that "[d]iscrimination under the ADA

encompasses not only adverse actions motivated by prejudice and fear of

disabilities, but also includes failing to make reasonable accommodations for a

plaintiff's disabilities.")

The plaintiff has the initial burden in an ADA matter of establishing a *prima*

*facie* case. Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996);

Newman v. GHS Osteopahtic, Inc., 60 F.3d 153, 157 (3d Cir. 1995). A *prima facie*

case is established by the plaintiff when she demonstrates: 1) she is a disabled

person within the meaning of the ADA; 2) she is otherwise qualified to perform the

essential functions of the job, with or without reasonable accommodations by the

employer; and 3) she has suffered an otherwise adverse employment decision as a

result of discrimination. Shiring v. Runyon, 90 F.3d 827, 831 (3rd Cir. 1996); Gaul

v. Lucent Technologies, 134 F.3d 576, 580 (3rd Cir. 1998).

If the plaintiff meets this initial burden, the court then applies the next step in

"the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411

U.S. 792, 803-805." Abramson v. William Patterson College, 260 F.3d 265, 281 (3d

17

Cir. 2001).  The burden of production shifts to the employer to "proffer a legitimate, non-discriminatory reason for the adverse employment decision."  Id. at 282.  An employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes v. Pierske, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  Id. (emphasis in original).  Once the employer meets this burden, the plaintiff must show that a jury  "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action."  Id. at 764.

Defendant contends that plaintiff cannot prevail on this claim because she cannot make out a *prima facie* case.  The position for which plaintiff applied was never filled and did not remain open, and she therefore cannot demonstrate that she suffered an adverse employment action.  The defendant does not argue that plaintiff cannot make out the rest of her *prima facie* case, i.e., that she is a person with a disability and that she is otherwise qualified to perform the job, with or without reasonable accommodations.  Hence, the question for the court on plaintiff's *prima facie* case is whether Wal-mart's decision not to create the position plaintiff sought constituted an adverse employment action.  Under the anti-discrimination laws, "'an

18

adverse employment action' . . . [is] an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Storey v. Burns Int'l Sevs., 390 F.3d 760 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries v. Ellerth, 524 U.S. 742, 761 (1998).

Defendant's position is that plaintiff's failure to receive a position that Wal-Mart never created does not amount to an adverse employment action, while plaintiff argues that defendant's failure to interview her for the position is sufficient to make out a *prima facie* case. In Young v. Temple University Hospital, the Third Circuit Court of Appeals concluded that a plaintiff who did not receive a non-existent position could not make out a *prima facie* case of Title VII retaliation. 108 Fair. Empl. Prac. Cas. 138, *14 (3d Cir. 2009). During an employment review, plaintiff had discussed with her direct supervisor the possibility of being promoted to the position of "Senior Certified Occupational Therapist Assistant." Id. at *2. Plaintiff had held this position at other rehabilitation centers, though the defendant did not have such a position. Id. The supervisor agreed with the plaintiff that she would be qualified for such a position if it existed, and promised to look into creating it. Id. The Third Circuit concluded that no adverse employment action had occurred, since

19

the Senior Certified Occupational Therapist Assistant job "did not exist when Young requested the promotion, and no one at Temple promised her such a position would (or could) be created. Young's subjective expectation that Temple would create an entirely new position for her (and her alone) cannot support a *prima facie* case of retaliation." Id. at *15.

The situation is similar here. After returning from her leave of absence, plaintiff discussed the possibility of interviewing for a potential management position with her supervisors. She did not receive a formal interview, but was instead informed that she lacked the qualifications necessary for such a promotion. Others, who plaintiff claims were less qualified, received interviews. In the end, however, no one was promoted. Plaintiff complains that she did not receive an interview for the position because of her disability, not because she lacked qualifications for the job. In the end, however, the court must conclude that no evidence indicates that plaintiff suffered from an adverse employment action. Defendant did not promote anyone, and thus did not make an adverse employment decision. The defendant's failure to interview plaintiff did not constitute any sort of change in her employment situation. Moreover, while plaintiff hoped to be promoted, like the plaintiff in Young, there was no position in which to promote plaintiff. Plaintiff argues that the company decided not to create the position to avoid having to promote her. She presents no evidence to support this claim, and a jury therefore could not credit it. Plaintiff therefore cannot make out a *prima facie* case, and the court will grant summary judgment on

20

this claim.

### B. Harassment under the ADA

Defendant also seeks summary judgment on plaintiff's claim of harassment under the ADA.  "A claim for harassment based on disability, like one under Title VII, would require a showing that 1) [plaintiff] is a qualified individual with a disability under the ADA; 2) she was subject to unwelcome harassment; 3) the harassment was based on her disability or a request for an accommodation; 4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and 5) that [defendant] knew or should have known of the harassment and failed to take prompt effective remedial action."  Walton v. Mental Health Association, 168 F.3d 661, 667 (3d Cir. 1999).  The Third Circuit Court of Appeals has found that "the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to ADA disparate treatment and retaliation claims."  Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2004).

In making a judgment about whether the work environment was hostile or abusive, "the environment must have been shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment."  Walton, 168 F.3d at 667.  In determining whether an environment was "objectively hostile or abusive," a court "must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

21

unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23). While a plaintiff need not show an injury or severe psychological trauma from her treatment, she must "show that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Id. (quoting Harris, 510 U.S. at 22).

Defendant contends that the conduct plaintiff complains of was not severe or pervasive enough to create liability. Defendant explores the conduct from plaintiff's supervisor, Jack Brong, and from her coworkers in addressing that issue. The conduct, defendant insists, was not so offensive as to alter the conditions of plaintiff's employment. In any case, Brong's conduct was not related to plaintiff's disability or use of FMLA leave and any harassment from coworkers stopped after plaintiff complained, meaning that it could not be severe or pervasive.

Plaintiff complains of harassment in several forms, arguing that such treatment created a hostile environment. She contends that she was harassed by coworkers and managers after she returned from her FMLA leave of absence. She points to several incidents. On December 27, 2007, a driver, Randy Smith made a comment in front of several other drivers and other workers that an employee could receive a "mental leave" at Wal-Mart. Two weeks later, another driver approached plaintiff during a delivery and asked her if she was having a "bipolar moment." Plaintiff also overheard other workers talking about "looney bins," "taking medication" and "going postal." In March 2008, a coworker gave plaintiff a mug with a picture of the dwarf

22

"Dopey" on it. On November 24, 2008, a worker approached plaintiff and asked her if she forgot to "take her pill." A week later, he told her that "I see you took your Prozac." Plaintiff also contends that Brong singled her out and gave her unmerited discipline and harsh treatment, playing on her bipolar symptoms to harass her. He threatened her with unwarranted discipline and reprimanded her as if she were a child in front of coworkers. He took away some of her work and gave it to other employees. Brong also denied plaintiff training. Such treatment, plaintiff contends, was humiliating and interfered with her ability to work.

The court finds that summary judgment is appropriate on this claim. Plaintiff certainly perceived this conduct as hostile.[1] In this case, however, the conduct was not objectively severe enough for a jury to find a hostile environment. Plaintiff complains of harassing treatment from her coworkers, but points to only a few incidents over a two-year period. Thus the conduct was infrequent. Moreover, those incidents consist of "offensive utterances," not harassing or intimidating conduct. Indeed, much of the conduct was either not directed at the plaintiff but seems more in the character of workplace banter, or appears to be unkind comments unrelated to

---

[1]In reply to plaintiff's brief, defendant argues that plaintiff was "over-sensitive" to the rough language and give-and-take of the workplace, and that this reaction "is unreasonable when it arises from her refusal to treat a condition which, if left untreated, results in oversensitivity and paranoia." (Reply br. at 10). Defendant also summarizes plaintiff's mental condition and contends that plaitniff "consistently failed to treat [that condition] during the relevant time." (Id. at 9). The court finds these arguments immaterial: the question here is not whether plaintiff treated her condition appropriately, but whether a reasonable person in plaintiff's condition would find the defendant's conduct harassing. Whether plaintiff followed her doctors' recommendations does not bear on whether defendant's conduct amounted to harassment.

plaintiff's disability.   Finally, plaintiff does not cite to any evidence that indicates that coworkers' conduct unreasonably interfered with her work performance.  Plaintiff also points to the behavior of a supervisor, Brong, who treated her badly.  Plaintiff does not have evidence by which a jury could conclude, however, that Brong's treatment amounted to anything more than bad behavior by a boss.  The evidence does not indicate that Brong's treatment was caused by plaintiff's disability or request for an accommodation.   Thus, the discrimination was insufficiently "severe or pervasive [enough] to alter the conditions of her employment and to create an abusive working environment."  Walton, 168 F.3d at 667.

### C.  FMLA and ADA Retaliation

Defendant also argues for summary judgment on plaintiff's retaliation claims, brought pursuant to both the ADA and the FLMA.  "[I]n order to establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" Fogleman v. Mercy Hosptial, 293 F.3d 561, 568 (3d Cir. 2002) (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  If the plaintiff can meet this burden, the burden-shifting test described above applies.  Krouse, 126 F.3d at 500-501.

Defendant apparently does not dispute that plaintiff engaged in protected

activity by taking leave and complaining about alleged harassment on the basis of her disability, but argues that plaintiff's retaliation claim should fail because she does not have evidence that Wal-mart took an adverse action against the her.  The types of conduct which constitute an adverse employment action in the retaliation and employment discrimination contexts are different.  Burlington Northern & Sante Fe Railway v. White, 548 U.S. 53, 67 (2006).  In the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "The significance of any given act of retaliation will often depend upon the particular circumstances" of the case.  Id. at 69.

Plaintiff alleges that retaliation came in several forms.  Most of those forms do not meet this standard.  The court has concluded that plaintiff did not face a hostile work environment based on her disability, and thus her claim that retaliation through the creation of a hostile environment cannot survive.  Plaintiff also contends that leaking confidential medical information meets this standard.  As explained above, however, the evidence indicates only that plaintiff suspected that Operations Manager Paul Brown had leaked information about her condition, and that he did not take seriously her complaints after receiving this information.  She offers no evidence beyond her suspicions, however, that Brown had any information about her

medical condition.  These events are thus not evidence that  Brown's comments were anything more than insensitive statements, and she cannot prevail on this claim.

Plaintiff does, however, allege that she was denied the opportunity to interview for a promotion after she had complained about the treatment from her supervisor and after she took medical leave.  The court has concluded that plaintiff cannot raise a failure to promote claim based on the facts surrounding this alleged job opening. The evidence establishes that there was no failure to promote.  Neither party denies, however, that plaintiff was provided with an opportunity to interview for a job opening shortly after she complained about alleged discrimination on the basis of her disability, and shortly after she returned from a medical leave.  The court finds that a reasonable worker would be dissuaded from complaining about such treatment if complaining meant that she would be denied an interview that could lead to a promotion.  Plaintiff has thus made out that portion of her *prima facie* case.

Plaintiff has also established a *prima facie* causal connection between her activity and defendants' adverse action.  "To establish the requisite causal connection a plaintiff must usually prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a patter of antagonism coupled with timing to establish a causal link."  <u>Lauren W. v. DeFlamis</u>, 480 F.3d 259, 267 (3d Cir. 2007).  Here, the alleged retaliation occurred shortly after plaintiff's complaint, establishing a sufficient temporal proximity between

the events.

Since plaintiff has made out a *prima facie* case on her retaliation claim, the court must now engage in the prescribed balance-shifting test. First, the burden shifts to defendant to "proffer a legitimate, non-discriminatory reason for the adverse employment decision." Id. at 282. An employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Pierske, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. (emphasis in original).

Here, defendant's proffered reason for failing to interview plaintiff for the potential opening or to fill that position is that the company's business needs did not require the position to be filled. Moreover, to the extent that plaintiff raises a claim based solely on the failure to interview her, defendant argues that the persons interviewed for the job better met the qualifications for the position than plaintiff. The court finds that defendant has met the burden here; these represent legitimate, non-discriminatory reasons for the employment decision, and the burden therefore shifts to the plaintiff to point to evidence by which a jury "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or

determinative cause of the employer's action." Id. at 764.

Plaintiff argues that defendant's stated reasons for refusing to interview her for the position were pretext for the real reasons. She insists that she sought an interview for the position, but was denied because she allegedly lacked relevant recent supervisory experience. By contrast, plaintiff insists, those interviewed for the position had less supervisory experience than she did. As explained above, plaintiff has evidence by which a jury could credit this view. A jury could find that the stated reason for the employment decision–plaintiff's lack of experience–was not the real reason. As such, plaintiff has met her burden in this context, and the court will deny the motion on this claim.

**Conclusion**

For the reasons stated above, the court will grant the defendant's motion for summary judgment in part and deny the motion in part. The claim will be granted as to plaintiff's employment discrimination and hostile environment claims, but denied with respect to plaintiff's retaliation claims. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIMBERLEY STOPPI,            :       No. 3:09cv916
            **Plaintiff**        :
                                :       **(Judge Munley)**
                                :
                                :
        **v.**                         :
                                :
WAL-MART TRANSPORTATION, LLC, :
            **Defendant**      :

## ORDER

**AND NOW**, to wit, this 26th day of August 2010, the defendant's motion for summary judgment (Doc. 19) is hereby **GRANTED** in part and **DENIED** in part, as follows:

     1.  The motion is **GRANTED** with respect to plaintiff's claims of employment discrimination pursuant to the ADA;

     2.  The motion is **GRANTED** with respect to plaintiff's hostile environment claim; and

.     3.  The motion is **DENIED** with respect to plaintiff's retaliation claims.


                             **BY THE COURT:**

                             **s/ James M. Munley**
                             **JUDGE JAMES M. MUNLEY**
                             **UNITED STATES DISTRICT COURT**